[Cite as *State v. Frazier*, 2011-Ohio-3189.]

STATE OF OHIO   )      IN THE COURT OF APPEALS
          )ss:      NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT )

STATE OF OHIO          C.A. No.   25338

   Appellee

   v.             APPEAL FROM JUDGMENT
                ENTERED IN THE
DORTHEA FRAZIER       AKRON MUNICIPAL COURT
                COUNTY OF SUMMIT, OHIO
   Appellant        CASE No.  08 CRB 08298

DECISION AND JOURNAL ENTRY

Dated: June 29, 2011

CARR, Judge.

{¶1} Appellant, Dorthea Frazier, appeals the judgment of the Akron Municipal Court. This Court affirms.

I.

{¶2} On June 29, 2008, Dorthea Frazier's son, Cody, was the subject of a traffic stop by the Akron police. This case arises out of the events which transpired immediately following the stop.

{¶3} Cody Frazier was stopped by police at the intersection of LaCroix Ave. and West Thornton St. in Akron, Ohio, following a brief vehicle pursuit. Officer Steve Hankins initiated the stop and Officer Mychal Brown assisted. Lieutenant Brian Simcox and Officer Brian Armstead arrived after Cody Frazier had already been taken into custody. Residents of the neighborhood had gathered outside of their homes to investigate the sirens and watch the arrest. The arrest occurred less than one hundred feet from the home of Dorthea Frazier's sister, Shawn

Weems. Ms. Frazier, her son Johnny Frazier, and Ms. Weems went down to the corner to talk to the arresting officers. The ensuing exchange gave rise to these proceedings.

{¶4} Ms. Frazier initially yelled to her son, "What the f*** are you doing?" Ms. Frazier then yelled at the arresting officers, "What the f*** are you arresting my son for? What are you doing?"

{¶5} Ms. Weems attempted to engage Lt. Simcox in a conversation to find out what had happened in regard to the stop. During the course of their conversation, Ms. Frazier began to yell at Lt. Simcox, saying, "You f***ing crooked a** cop," and "You're a b****."

{¶6} Lt. Simcox responded by saying, "Look, you need to cease. You need to stop." Residents of the neighborhood began to gather as Ms. Frazier continued cursing and swearing. As the crowd began to make its way closer to the arrest scene, Lt. Simcox again told Ms. Frazier to, "[s]top and go in your house." At this point there were between 50 to 70 people around and only seven or eight officers. Lt. Simcox would later testify that the crowd was "beginning to get agitated and it was – it was close to being a bad situation."

{¶7} Officer Brent Bauknecht had also arrived at the scene. Officer Bauknecht testified that while officers are trained to take a certain amount of verbal abuse, Ms. Frazier's comments were, "much more elevated than it typically is." Officer Bauknecht testified that, "The verbal abuse is one thing. Her yelling and screaming, cursing was enticing the crowd even more, which, for me, was making it more of an officer safety issue than so much her being loud and disorderly."

{¶8} Ms. Weems, who was standing next to Lt. Simcox, then said, "Simcox, you know she doesn't like you. She's never liked you." Lt. Simcox responded, "That's fine, but I'm not going to have her calling police mother f***ers and call me a mother f***er and a crooked a**

cop and inciting this crowd. I'm not going to allow it, and she's either going to stop and go in her house or she's going to be arrested." At this point, Lt. Simcox had given Ms. Frazier six to eight verbal commands to be quiet. As Ms. Frazier continued to "berate the officers," Lt. Simcox said, "Just shut up and go in the house. Shut your mouth and go inside or you're going to be arrested." Ms. Frazier, in turn, responded "F*** you, you crooked a** b****."

{¶9} Lt. Simcox then told Ms. Frazier that she was under arrest. Ms. Frazier proceeded to rapidly make her way back toward the house. Lt. Simcox testified that she was "in a hurry to get back into that house as soon as I told her she was under arrest." Lt. Simcox and Officer Armstead pursued Ms. Frazier. Lt. Simcox pointed at Ms. Frazier and said, "You're under arrest." Lt. Simcox testified that they were delayed in their pursuit of Ms. Frazier because "a large gentleman" stepped in front of him and said, "Hey, Simcox, mom, she's good. She's cool. Let her go into the house. She's good." The man, who was later identified as Ms. Frazier's nephew, Rashad, delayed the pursuit of Ms. Frazier for ten to fifteen seconds. After Ms. Frazier entered the home, Lt. Simcox and Officer Armstead knocked on the front door and instructed her to open the door or else it would be kicked in. Ms. Weems had followed the officers up to the house and when she was warned that the door would be kicked in if it was not opened, she proceeded to unlock the door.

{¶10} As the officers entered the home, Ms. Frazier walked by talking on the phone and sat on the living room couch. Officer Armstead told Ms. Frazier she was under arrest and she responded, "No, I'm not" and pulled her arm away from him. Officer Armstead and Lt. Simcox then grabbed Ms. Frazier by the arm in accordance with the "escort position" procedure, where each officer places one hand on the back of the triceps and the other hand on the wrist. Lt. Simcox testified that Ms. Frazier was "twisting and turning." Officer Armstead started to bring

Ms. Frazier's left arm behind her, and then Ms. Frazier started to lunge forward and away from Lt. Simcox. Both Lt. Simcox and Officer Armstead heard Ms. Frazier's arm break. Officer Armstead then instructed Lt. Simcox not to place Ms. Frazier in handcuffs. The officers proceeded to call EMS. Officer Armstead testified that the hospital instructed EMS not to take Ms. Frazier to the hospital.

{¶11} Ms. Frazier was charged with one count of resisting arrest in violation of R.C. 2921.33, a misdemeanor of the second degree, and disorderly conduct in violation of R.C. 2917.11(A)(2), a misdemeanor of the fourth degree. The matter proceeded to trial by jury on January 27, 2009. The jury failed to reach a verdict on the count of resisting arrest, and a mistrial was declared as to that charge. The jury found Ms. Frazier guilty on the count of disorderly conduct. Ms. Frazier was sentenced to 30 days in jail and assessed a $100 fine.

{¶12} The count of resisting arrest was re-tried to a jury on December 9, 2009. The trial court subsequently discharged the jury and declared a mistrial after members of the jury declared that they could not come to a unanimous verdict.

{¶13} On February 18, 2010, Ms. Frazier was again tried on the count of resisting arrest. On February 19, 2010, the jury found Ms. Frazier guilty and the trial court accepted the verdict. Ms. Frazier was sentenced to 30 days in jail and assessed a $100 fine. The jail term ran concurrently with the 30-day sentence Ms. Frazier received as a result of her disorderly conduct conviction.

{¶14} Ms. Frazier filed a notice of appeal on April 8, 2010. On appeal, Ms. Frazier raises three assignments of error.

II.

## ASSIGNMENT OF ERROR I

"THE TRIAL COURT ERRED BY DENYING APPELLANT FRAZIER'S PROPOSED JURY INSTRUCTION THAT RECOGNIZED AN ELEVATED LEVEL OF FREEDOM OF SPEECH FROM A DEFENDANT TOWARD A POLICE OFFICER AND AN INDIVIDUAL'S INHERENT RIGHT TO FREEDOM OF SPEECH IN THAT SETTING GROUNDED IN THE FIRST AMENDMENT OF THE UNITED STATES CONSTITUTION AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT."

{¶15} In her first assignment of error, Ms. Frazier argues that the trial court erred in failing to give a proposed jury instruction with respect to the disorderly conduct charge. This Court disagrees.

{¶16} In support of her first assignment of error, Ms. Frazier contends that she "was entitled to an instruction on freedom of speech under the First Amendment as the conduct underlying her conviction contained elements of constitutionally protected expression." Ms. Frazier asserts that her speech did not reach the level of fighting words when directed toward a reasonable law enforcement officer-complainant, and, therefore, her speech was protected speech and not punishable under R.C. 2917.11(A)(2). Ms. Frazier proposed an instruction stating that she could not be found guilty if the jury determined that her conduct was constitutionally protected speech. The trial court denied the proposed instruction. Ms. Frazier contends this violated her right to due process of law.

{¶17} The Ohio Rules of Criminal Procedure provide that the trial judge shall charge the jury in accordance with Crim.R. 30. In construing Crim.R. 30(A), the Supreme Court of Ohio has stated that "after arguments are completed, a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder." *State v. Comen* (1990), 50 Ohio St.3d 206, paragraph two

of the syllabus. "A defendant is entitled to have his instructions included in the charge to the jury only when they are a correct statement of the law, pertinent and not included in substance in the general charge." *State v. Theuring* (1988), 46 Ohio App.3d 152, 154. If a requested instruction is not pertinent to the facts of the case, the court need not include it in its charge to the jury. See *State v. Guster* (1981), 66 Ohio St.2d 266, 271.

**{¶18}** Ms. Frazier proposed the following jury instruction:

"The defendant is charged with disorderly conduct. Before you can find the defendant guilty, you must find beyond a reasonable doubt that on or about the Twenty-Ninth day of June, 2008, and in Summit County, Ohio, the defendant recklessly caused inconvenience, annoyance, or alarm to another by:

"(A)(2) (making unreasonable noise) (making an offensively coarse [utterance] [gesture] [display]) (communicating unwarranted and grossly abusive language to another person), when the words spoken are likely, by their very utterance, to inflict injury or to provoke the average person to an immediate retaliatory breach of the peace.

"In the event that you find that the Defendant's conduct was Constitutionally protected free speech, then you must find the defendant not guilty. State v. Lessin (1993), 67 Ohio St.3d 487. A person cannot be convicted of disorderly conduct based on the words the person has spoken because such speech is constitutionally protected unless the defendant's words rise to the level of fighting words.

"A person cannot be convicted of disorderly conduct by the use of words because the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. *Houston v. Hill* (1987), 482 U.S. 451.

"Even if the criminal offense charged arises from conduct that encompasses both a constitutionally protected act and an act that is not constitutionally protected, the failure of the trial court to instruct the jury that it may not consider evidence of the constitutionally protected act[] as proof of defendant's guilt is reversible error. Id.

"A person may not be punished under R.C. 2917.11(A)(2) for 'recklessly causing inconvenience, annoyance, or alarm to another,' by making an 'offensively coarse utterance' or [']communicating unwarranted and grossly abusive language to any person,' unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace. *State v. Hoffman* (1979), 57 Ohio St.2d 129."

**{¶19}** In her proposed jury instruction, Ms. Frazier cites to the Supreme Court of Ohio's decision in *State v. Lessin* (1993), 67 Ohio St.3d 487. In *Lessin*, there was uncontroverted evidence that the defendant had burned an American flag during a protest of the U.S. involvement in the Persian Gulf conflict. The Supreme Court held that "[w]hen a criminal offense charged arises from conduct that encompasses both a constitutionally protected act and an act that is not constitutionally protected, failure of the trial court to instruct the jury that it may not consider evidence of the constitutionally protected act as proof of the defendant's guilt is reversible error." Id. at syllabus. The high court concluded that the trial court erred in declining to give a proposed jury instruction which stated, "The state cannot prosecute someone for exercising her right to free speech. The law applicable to this case is that speaking & burning the flag are protected speech and are protected by the [F]irst [A]mendment & the def[endant] cannot be convicted for such activity." Id. at 494. Ms. Frazier further cited in her instruction to the United States Supreme Court's decision in *Houston v. Hill* (1987), 482 U.S. 451, for the proposition that "[a] person cannot be convicted of disorderly conduct by the use of words because the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers."

**{¶20}** Ms. Frazier's proposed jury instruction was not necessary given the facts at issue here. Unlike the circumstances in *Lessin*, there was not uncontroverted evidence in this case that any portion of Ms. Frazier's behavior constituted a constitutionally protected act which would necessitate a jury instruction pertaining to free speech. While there was no question in *Lessin* that the specific act of burning an American flag in protest is protected by the First Amendment, it was necessary for the trier of fact in this case to consider Ms. Frazier's conduct in its entirety when making a determination as to whether she had broken the law.

**{¶21}** With respect to the standard which must be applied when a police officer is an alleged victim of disorderly conduct, this Court has recognized the Supreme Court of Ohio's decision in *Cincinnati v. Karlan* (1974), 39 Ohio St.2d 107, as a hallmark case which resolved the question of when free speech becomes unprotected fighting words in the context of police interaction. *Akron v. Bozic* (Oct. 17, 2001), 9th Dist. No. 20351. In *Karlan*, the Supreme Court determined that the statements "I hate all of you f***ing cops," "get out of my way you f***ing, prick-a** cops," and "prick-a**ed cop," made to a police officer were unprotected fighting words punishable as disorderly conduct. *Karlan*, 39 Ohio St.2d at paragraph three of the syllabus. In making this determination, the Supreme Court held:

> "[P]ersons may not be punished for speaking boisterous, rude or insulting words, even with the intent to annoy another, unless the words by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." (Citations omitted.) Id. at paragraph one of the syllabus.

The Supreme Court defined "fighting words" as "epithets, used in a public place and wilfully directed at those who can hear them [that] are likely to provoke the average person to an immediate retaliatory breach of the peace[.]" Id. at paragraph two of the syllabus.

**{¶22}** In *Bozic*, this Court confronted a situation where a defendant made the following statements to police:

> "'You f***ing Akron police, you're a bunch of p******, you got the wrong people, this is f***ing bulls***,' 'You f***ing Akron police, you never do anything *** it's f***ing bulls***.' When asked to disperse, Bozic continued a string of expletives. To the last such order, made after Bozic's outrageous behavior caused the crowd to form again after it was largely dispersed by police, Bozic offered 'F*** you,' whereupon she was arrested." *Bozic*, supra.

This Court concluded that "Bozic's antics were a spark that reignited an already dispersed crowd. The First Amendment does not protect fighting words that incite a potential riot or constitute attacks against the police." Id.

**{¶23}** In support of her position that her proposed jury instruction was relevant and necessary in this case, Ms. Frazier argues in her merit brief that this Court should abandon the "reasonable person" test set forth in *Karlan* and adopt a "reasonable officer under the circumstances" test. We decline to depart from our established precedent at this time as *Karlan* remains binding precedent in Ohio. Moreover, Ms. Frazier's language rose to the level of fighting words and cannot be characterized as merely rude or insulting words generally directed toward law enforcement. Officer Steve Hankins testified that there were between 50 and 70 people at the scene and Ms. Frazier's conduct "riled other people up." One officer who responded to the scene, Officer Janusz Jaskolka, described the crowd as "[o]ut of control." Ms. Frazier's words were directed specifically at an individual, Lt. Simcox. There was testimony that as her verbal barrage continued, the crowd closed in on the scene of the arrest and became progressively more agitated. She disregarded up to eight requests to cease her behavior. The testimony revealed that Lt. Simcox asked Ms. Frazier to cease and return to the house because she was inciting the crowd. Officer Bauknecht testified that upon arriving at the scene, he noticed Ms. Frazier because she was "being very loud and obscene." Officer Bauknecht testified that it was evident that there was some past history between Ms. Frazier and Lt. Simcox. Lt. Simcox and other officers attempted to get Ms. Frazier to cease her behavior for two or three minutes. Officer Bauknecht specifically testified that Ms. Frazier's words created an "officer safety issue." Under the aforementioned circumstances where Ms. Frazier's conduct incited the crowd and brought the safety of law enforcement into question, Ms. Frazier's proposed jury instruction was not relevant and necessary for the jury to weigh the evidence and discharge its duty as the fact finder. *Comen*, supra.

**{¶24}** The first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

"APPELLANT FRAZIER'S RIGHT TO EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION, AND SECTION 2, ARTICLE 1 OF THE OHIO CONSTITUTION, WAS VIOLATED WHEN THE STATE USED A PEREMPTORY CHALLENGE TO EXCLUDE THE ONLY FEMALE AFRICAN-AMERICAN JUROR OF THE PANEL IN VIOLATION OF BATSON V. KENTUCKY[] (1986), 476 U.S. 79."

{¶25} In her second assignment of error, Ms. Frazier argues that she was denied her right to equal protection under the law when the State used a peremptory challenge to exclude an African-American female from the jury. This Court disagrees.

{¶26} Ms. Frazier's second assignment of error pertains to the third trial on the resisting arrest charge. Ms. Frazier contends that the State's use of a peremptory challenge to exclude Vickie Baker, a female African-American, from the jury was unconstitutional. Ms. Frazier contends that the circumstances of this case, where Ms. Baker's removal resulted in a jury that did not include an African-American, constituted purposeful discrimination in violation of the Equal Protection Clauses of both the United States and Ohio Constitutions.

{¶27} In *Batson v. Kentucky* (1986), 476 U.S. 79, 89, the United States Supreme Court concluded that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]" The Supreme Court of Ohio subsequently stated:

> "A court adjudicates a *Batson* claim in three steps. First, the opponent of the peremptory challenge must make a prima facie case of racial discrimination. Second, if the trial court finds this requirement fulfilled, the proponent of the challenge must provide a racially neutral explanation for the challenge. However, the explanation need not rise to the level justifying exercise of a challenge for cause. Finally, the trial court must decide based on all the circumstances, whether the opponent has proved purposeful racial discrimination." (Internal citations and quotations omitted.) *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, at ¶106.

"To make a prima facie case of such purposeful discrimination, an accused must demonstrate: (a) that members of a recognized racial group were peremptorily challenged; and (b) that the facts

and any other relevant circumstances raise an inference that the prosecutor used the peremptory challenges to exclude jurors on account of their race." (Internal citations and quotations omitted.) *State v. Hill* (1995), 73 Ohio St.3d 433, 444-45. A trial court's finding that there was a lack of any discriminatory intent on behalf of the State will not be reversed on appeal unless it was clearly erroneous. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, at ¶61.

{¶28} In this case, Ms. Frazier's claim centers on the third prong of the *Batson* test. Specifically, Ms. Frazier contends that the reasons for challenging an African-American jury panelist, Ms. Baker, could also be applied to a Caucasian jury panelist, Linda Prarat. Ms. Frazier argues that a side-by-side comparison of Ms. Baker and Ms. Prarat illustrates the sort of purposeful discrimination that the United States Supreme Court found to be unconstitutional in *Miller-El v. Dretke* (2005), 545 U.S. 231. In interpreting *Miller-El*, the Supreme Court of Ohio has stated:

> "In *Miller-El*, the court found several disturbing factors that together showed that the prosecutor's reasons for challenging African-American jurors were pretextual: (1) the 'bare statistics,' which showed that of the 20 African-Americans on the 108-person venire, only one served, and ten African-Americans were peremptorily struck by the prosecution; (2) the similarity of answers to voir dire questions by African-American jurors who were peremptorily challenged and answers by non-African-American jurors who were allowed to serve; (3) the broader patterns of practice, which included jury shuffling; (4) disparate questioning of African-American and non-African-American jurors; and (5) evidence that the district attorney's office had historically discriminated against African-Americans in jury selection." (Internal citations omitted.) *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, at ¶67.

{¶29} In support of her position, Ms. Frazier argues that there was disparate questioning of Ms. Baker and Ms. Prarat during voir dire. The following exchange occurred between the prosecutor and Ms. Baker:

> "Prosecutor:    Ms. Baker, I know you mentioned that your son had been charged with resisting arrest. How long ago was that?

"Ms. Baker: My son, he has a mental illness and he has a lot of issues with doing thing repeatedly and this last time, which was a month ago, he had the same problem with going through situations and getting busted and stuff, so it's basically like a revolving door. He's in and out of it going through his same situation.

"Prosecutor: Is that here in Akron?

"Ms. Baker: Yes.

"Prosecutor: And is that usually with the Akron police? Okay. Do you [] mind if I ask what his name is?

"Ms. Baker: ***

"Prosecutor: Do you believe -- from that, have the police been fair with him? Do they mistreat him? The importance of that question is, obviously, the defendant is charged with resisting arrest and if you have this kind of -- your son has this kind of history and has these kind of concerns -- for you it raises these kind of concerns. You know, with that -- with your son's history being what that is, would that effect how you viewed the evidence that would be presented today, how you would reach the decision, do you think that would effect it?

"Ms. Baker: Effect me how? In what way?

"Prosecutor: I guess my question is, have you been there for any of the times your son's been arrested by the police?

"Ms. Baker: Yeah.

"Prosecutor: And do you think that the police treated him properly or do you think that they were rough with him?

"Ms. Baker: Well, the times that I've been with him, he's been very, you know, not resisted, but it's been sometimes that he has been resisted and I haven't been there, so I don't know what may have occurred. He doesn't share that with me. He just end up there and it is a concern of mine what might go on during the time he is being arrested.

"Prosecutor: That's kind of what I'm leading to. Do you think that the police have been fair with him when they get with him and arrested him from what you know or do you think the police have mistreated him?

"Ms. Baker:   I've asked him have they mistreated him and he -- he -- I haven't gotten a straight answer from him, because it is a concern of mine."

{¶30} Ms. Frazier contrasts the exchange between the prosecutor and Ms. Baker with the exchange between the prosecutor and the non-African American panelist, Ms. Prarat.

"Prosecutor:   With your son and this -- were you involved at all or aware at all in what was going on in terms of the process whether he plead --

"Ms. Prarat:   No.

"Prosecutor:   -- was tried, anything of that nature.

"Ms. Prarat:   Was I aware that he plead?

"Prosecutor:   No.  No.  I'm not worried about the incident itself.  Just the judicial process involved.  From what you remember, did he plead?  Did he go to trial?

"Ms. Prarat:   He plead.

"Prosecutor:   He plead, and do you believe he was treated fair by the system or do you think he was --

"Ms. Prarat:   Yes.

"Prosecutor:   And having that experience, do you think that that would effect your judgment of how you would hear the evidence?  Would you be more inclined to believe one side or the other?

"Ms. Prarat:   No."

{¶31} At trial, Ms. Frazier raised a *Batson* challenge to the removal of Ms. Baker from the jury pool on the basis that the State did not demonstrate that the challenge was race neutral. Ms. Frazier argued that, "There was only one African American on that portion of the panel and based on the whole array of the jury, we believe that the Court should have deprived the prosecutor of his preemptory challenge."  The State countered that there was no pattern involved in the use of its challenges and that the first potential juror removed was actually a white male. The State further noted that Ms. Baker was not the only African-American in the jury panel and

that the State had no objection to the other African-American female. The State further expressed concerns with Ms. Baker because of the "vagueness of her answers" regarding whether her son's interactions with law enforcement would cause her to be biased. The prosecutor specifically stated that, "she wouldn't give me a clear answer and it created enough concern for me, as to her possible impartiality *** that I felt it was better to excuse her." The State concluded by stating that decision had nothing to do with race.

{¶32} Ms. Frazier conceded that there was another African-American on the panel that ended up as an alternate but noted that there was no mechanism which would have allowed Ms. Frazier to get that individual on the jury. Ms. Frazier also argued that it was unfair to require the demonstration of a pattern when there was only one possible African-American juror.

{¶33} The trial court concluded that there was no pattern of discrimination. The trial court specifically found that the State "did demonstrate a race neutral explanation which the Court heard during the course of the voir dire and that that race neutral explanation rises to the level that the Batson challenge can be overcome."

{¶34} Under these facts, Ms. Frazier has not demonstrated that the State's reason for using a preemptory challenge on Ms. Baker was pretextual. The "bare statistics" with respect the State's use of peremptory challenges do not serve as evidence of purposeful discrimination on the basis of race. The absence of African-Americans on the jury appears to be the result of the limited number of African-Americans in the original jury pool. Ms. Frazier's argument pertains to the exclusion of a single prospective juror, Ms. Baker. The record indicates that the State did not express any concern with the other prospective juror who was an African-American female. The record also indicates that the State exercised a peremptory challenge to remove a Caucasian male. Furthermore, there was a patent difference in the answers to voir dire questions by Ms.

Baker and Ms. Prarat. Ms. Baker's answers were indistinct and she could not definitively say whether her son's experience with law enforcement would impact her ability to remain neutral. Ms. Prarat, on the other hand, succinctly stated that her son's experience with law enforcement would not impact her ability to be impartial. With respect to the broader patterns of practice, Ms. Frazier has not suggested that jury shuffling or any similar practice was present in this case. Ms. Frazier does, however, clearly assert that there was disparate questioning of Ms. Baker and Ms. Prarat. A review of the exchanges during voir dire reveals that the prosecutor did ask Ms. Baker several questions which were supplemented with comments in an attempt to provide context. This was due, in part, to the indistinct answers Ms. Baker offered in response to the prosecutor's initial questions. While Ms. Prarat often gave "Yes" and "No" answers, Ms. Baker tended to respond to questions with questions of her own or explanations which were devoid of significant detail. Thus, while the prosecutor may not have asked identical questions to Ms. Baker and Ms. Prarat, it cannot be said that the prosecutor used a "graphic script," or any other sort of severe rhetoric, which "provided [] evidence that the prosecution wanted blacks off the jury." *Frazier*, 115 Ohio St.3d at ¶70, citing *Miller-El*, 545 U.S. at 258. Finally, there was no evidence that the prosecutor's office in this case has historically discriminated against African-Americans in jury selection. In light of the aforementioned considerations, Ms. Frazier cannot prevail on her argument that the State had an intent to discriminate in its use of peremptory challenges.

{¶35} Given the circumstances of this case, the State's use of preemptory challenges did not constitute a violation of Ms. Frazier's right to equal protection under the law. The second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

"THE TRIAL COURT ERRED AND VIOLATED APPELLANT FRAZIER'S
DUE PROCESS RIGHTS AND RIGHT TO A FAIR TRIAL UNDER THE

SIXTH AND FOURTEENTH AMENDMENTS AND SECTION 10, ARTICLE 1 OF THE OHIO CONSTITUTION WHEN IT FAILED TO INSTRUCT THE JURY ON THE PROPER MENS REA FOR DISORDERLY CONDUCT WHICH REQUIRES THE DEFENDANT TO HAVE ACTED RECKLESSLY PURSUANT TO R.C. 2917.11(A)(2)."

{¶36} In her third assignment of error, Ms. Frazier argues that the trial court committed plain error when it failed to instruct the jury on the proper mens rea element for disorderly conduct. This Court disagrees.

{¶37} In support of her assignment of error, Ms. Frazier cites to the Supreme Court of Ohio's decision in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, at ¶36, for the proposition that a defendant has a constitutional right to have his or her conviction rest upon a jury verdict that found her guilty of every element of the crime of which she was charged. In reviewing jury instructions on appeal, we must consider the specific charge at issue in the context of the entire charge, not in isolation. *State v. Thompson* (1987), 33 Ohio St.3d 1, 13. An inadequate jury instruction that, in effect, misleads the jury constitutes reversible error. *Sharp v. Norfolk & W. Ry. Co.* (1995), 72 Ohio St.3d 307, 312, citing *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12. Ms. Frazier argues that her disorderly conduct conviction should be reversed because the trial court never instructed the jury on the mens rea element of "recklessly." Ms. Frazier contends that the omission of the mens rea element from the instruction had the effect of turning disorderly conduct into a strict liability offense.

{¶38} Ms. Frazier acknowledges that she did not object to the jury instructions given at trial and that this matter must be analyzed under a plain error standard of review. Pursuant to Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To constitute plain error, the error must be obvious and have a substantial adverse impact on both the integrity of, and the public's

confidence in, the judicial proceedings. *State v. Tichon* (1995), 102 Ohio App.3d 758, 767. A reviewing court must take notice of plain error only with the utmost caution, and only then to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. No. 03CA008241, 2004-Ohio-1067, at ¶12. This Court may not reverse the judgment of the trial court on the basis of plain error, unless appellant has established that the outcome of trial clearly would have been different but for the alleged error. *State v. Kobelka* (Nov. 7, 2001), 9th Dist. No. 01CA007808, citing *State v. Waddell* (1996), 75 Ohio St.3d 153, 166.

{¶39} The Supreme Court of Ohio has stated that the "[f]ailure of a trial court to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does not per se constitute plain error under Crim.R. 52(B)." *State v. Adams* (1980), 62 Ohio St.2d 151, at paragraph two of the syllabus. The *Adams* Court further held that, "[w]here a trial court's failure to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged is asserted to be plain error under Crim.R. 52(B), the reviewing court must examine the record in order to determine whether that failure may have resulted in a manifest miscarriage of justice." Id. at paragraph three of the syllabus, following *State v. Long* (1978), 53 Ohio St.2d 91, paragraph three of the syllabus.

{¶40} Ms. Frazier was convicted of disorderly conduct under R.C. 2917.11(A)(2), which states:

> "(A) No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following:
>
> "***
>
> "(2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person[.]"

**{¶41}** The trial transcript indicates that the following instruction was given with respect to the charge of disorderly conduct:

"Now, before you can find the defendant, Dorthea Frazier, guilty of disorderly conduct, you must find beyond a reasonable doubt that on or about the 29th day of June, 2008, and in the City of Akron, County of Summit, State of Ohio, Dorthea Frazier did make unreasonable noise or offensively course (sic) utterance, gesture or display or communicate unwarranted and grossly abusive language to another person when the words spoken are likely by their very utterance to inflict injury or to provoke the average person to an immediate retaliatory breach of the peace.

"Now, if you find the State proved beyond a reasonable doubt all the essential elements of the offense of disorderly conduct, your verdict must be guilty as to disorderly conduct against Dorthea Frazier

"If you find that the State has failed to prove beyond a reasonable doubt any one of the essential elements of the offense of disorderly conduct, your verdict must be not guilty as to the disorderly conduct count against Dorthea Frazier.

"***

"Now, the charges set forth in each count of this case constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately and you must state your finding as to each count uninfluenced by your verdict as to any other count."

**{¶42}** It is evident that the trial court did not explain to the jury that the element of "recklessly" as set forth in R.C. 2917.11(A) must be proven beyond a reasonable doubt in order to find Ms. Frazier guilty of disorderly conduct. A criminal defendant has a due process right that requires the State to prove every element of the crime beyond a reasonable doubt. *In re Winship* (1970), 397 U.S. 358. In its merit brief, the State concedes that the trial court "failed to specifically define 'recklessly' as to Disorderly Conduct." The State emphasizes, however, that the trial court did include a definition of recklessly with its instruction on resisting arrest. The State contends that because the instructions for resisting arrest and disorderly conduct were given together, it is "reasonable and probable that the jury would rely upon the definition of 'recklessly' provided to it when considering the Disorderly Conduct charge." The State also

notes that the jury instructions were available for the jury to review. The State further asserts that not defining "recklessly" a second time did not fundamentally alter the outcome of the trial as Ms. Frazier's language was the epitome of "fighting words."

{¶43} A review of the record reveals that the trial court's failure to properly instruct the jury did not result in a manifest miscarriage of justice as there was overwhelming evidence that Ms. Frazer was guilty of disorderly conduct.

{¶44} Officer Brown testified that Cody Frazier was cooperative as law enforcement placed him under arrest. Nevertheless, Ms. Frazier proceeded down to the scene and yelled to her son, "What the f*** are you doing?" Ms. Frazier then asked the police, "What the f*** are you arresting my son for? Upon arriving at the scene, Officer Bauknecht noticed that Ms. Frazier was being loud and obscene. Lt. Simcox testified that upon his arrival at the scene, Ms. Frazier could be heard screaming, "crooked a** cops," "b****es," "mother f***ers," and "what they're doing [is] bull****." As noted above, Ms. Frazier then directed a series of remarks directly at Lt. Simcox, yelling, "You f***ing crooked a** cop," and "You're a b****."

{¶45} The crowd closed in on the scene of the arrest as the exchange continued. Lt. Simcox testified that he told Ms. Frazier to cease because, "[t]he crowd from Thorton start[ed] to cross over and her family start[ed] to cross closer to the arrest scene." Lt. Simcox testified that the crowd was "beginning to get agitated and it was – it was close to being a bad situation." Ms. Weems told Lt. Simcox that he should know that Ms. Frazier "never liked" him. Lt. Simcox replied that he would not allow Ms. Frazier to berate the police and incite the crowd. Lt. Simcox testified he had a concern for officer safety as well as the safety of the people in the crowd. Officer Jaskolka testified that the crowd was "[o]ut of control." Officer Bauknecht testified that Ms. Frazier's words enticed the crowd and created an "officer safety issue." Ms. Frazier ignored

up to eight requests to cease her behavior which was inciting the crowd. Upon being ordered to return to her house or else she would be placed under arrest, Ms Frazier responded, "F*** you, you crooked a** b****."

{¶46} Ms. Frazier's remarks were directed at Lt. Simcox individually and were likely, by their very utterance, to inflict injury or provoke an immediate breach of the peace. Despite persistent orders to cease her behavior, Ms. Frazier continued to engage in conduct that served to transform an otherwise orderly arrest into a public spectacle that threatened the safety of law enforcement officials, as well as a crowd of 50 to 70 people. In light of the aforementioned evidence, we cannot conclude that the outcome of trial clearly would have been different but for the trial court's error. See *Kobelka*, supra. Thus, the trial court's failure to instruct the jury on each element of disorderly conduct did not rise to the level of plain error.

{¶47} The third assignment of error is overruled.

III.

{¶48} Ms. Frazier's assignments of error are overruled. The judgment of the Akron Municipal Court is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Akron Municipal Court, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
DICKINSON, P. J.
CONCUR

APPEARANCES:

J. DEAN CARRO, Director Legal Clinic, University of Akron School of Law, Office of Appellate Review, for Appellant.

CHERI CUNNINGHAM, Director of Law, DOUGLAS J. POWLEY, Chief City Prosecutor, and, JEREMY A. VEILLETTE, Assistant City Prosecutor, for Appellee.