[Cite as *State v. Hunter*, 2014-Ohio-910.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

GEVONTE D. HUNTER

    Appellant

C.A. No.      26610

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.      11 11 3220 (A)

DECISION AND JOURNAL ENTRY

Dated: March 12, 2014

MOORE, Presiding Judge.

{¶1} Defendant, Gevonte Hunter, appeals from his conviction in the Summit County Court of Common Pleas. We affirm.

I.

{¶2} On July 19, 2011, shortly after 5:00 p.m., Salim Suleiman was fatally shot outside of a business known as Kelley's Carryout in Akron, Ohio. The Summit County Grand Jury indicted Mr. Hunter and another man, Alan Lollis, on the following charges stemming from these incidents: one count of aggravated murder in violation of R.C. 2903.01(B), one count of murder in violation of R.C. 2903.02(B), and two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) and (A)(3), with gun specifications attendant to all counts pursuant to R.C. 2941.145. Mr. Hunter pleaded not guilty to the charges, and the case proceeded to jury trial. The jury found Mr. Hunter guilty on all charges.

{¶3}     In a sentencing entry issued on July 31, 2012, the trial court merged all of the counts, and sentenced Mr. Hunter on the aggravated murder conviction and gun specification to a total term of incarceration of thirty-three years to life.  Mr. Hunter timely appealed from the sentencing entry, and he now presents five assignments of error for our review.  We have consolidated Mr. Hunter's first and second assignments of error to facilitate our discussion.

II.

### ASSIGNMENT OF ERROR I

THE STATE OF OHIO FAILED TO PROVIDE SUFFICIENT EVIDENCE TO SUPPORT A GUILTY FINDING AND CONVICTION OF [MR.] HUNTER FOR AGGRAVATED MURDER, MURDER, AND/OR TWO COUNTS OF AGGRAVATED ROBBERY.

### ASSIGNMENT OF ERROR II

THE JURY'S VERDICTS AND CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶4}     In his first assignment of error, Mr. Hunter contends that his convictions were not supported by sufficient evidence.  In his second assignment of error, Mr. Hunter argues that his convictions are against the manifest weight of the evidence.  We disagree with both contentions.

{¶5}     Initially, we note that Mr. Hunter, although separately assigning his challenges to the sufficiency and the weight of the evidence, consolidated his argument as to these assignments of error in his brief.  *See* App.R. 12(A)(2) (appellate court "may disregard an assignment of error presented for review if the party raising it  * * * fails to argue the assignment separately in the brief, as required under App.R. 16(A)").  Although Mr. Hunter has couched all of his arguments in terms of challenging both the sufficiency and weight of the evidence, his arguments appear to all speak to the weight of the evidence.  Therefore, we will limit our review to the weight of evidence.

**{¶6}** When a defendant asserts that his conviction is against the manifest weight of the evidence:

> [A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten,* 33 Ohio App.3d 339, 340 (9th Dist.1986).

**{¶7}** Mr. Hunter was convicted of aggravated murder in violation of R.C. 2903.01(B), murder in violation of R.C. 2903.02(B), and two counts of aggravated robbery in violation of R.C. 2911.01(A)(1) & (3), together with gun specifications attendant to all counts pursuant to R.C. 2941.145(A).

**{¶8}** In regard to aggravated murder and murder, R.C. 2903.01(B) provides that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, trespass in a habitation when a person is present or likely to be present, terrorism, or escape." R.C. 2903.02(B) provides that "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

**{¶9}** In regard to aggravated robbery, R.C. 2911.01 provides, in relevant part:

> (A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

(3) Inflict, or attempt to inflict, serious physical harm on another.

{¶10} R.C. 2941.145(A) and R.C. 2929.14(B)(1)(a) require a court to impose a three-year mandatory prison term where the indictment specifies "that * * * the offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

{¶11} As part of the State's case-in-chief, it produced the testimony of Lashawna Boswell, Mr. Suleiman's brother Fadi Suleiman, law enforcement officers from the City of Akron Police Department, the Summit County Medical Examiner, forensic scientists from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), an employee of LabCorp, employees of cellular telephone service providers, and Tasha Thomas.

{¶12} Lashawna Boswell testified that she is Mr. Hunter's aunt. Ms. Boswell's cousin lives on Fernwood Drive near Kelley's Carryout, and there is a cut through a yard that is adjacent to her cousin's house, on which people can walk to get to Kelley's. From her cousin's living room, she can see the cut through a picture window. On July 19, 2011, Ms. Boswell was drinking alcohol at her cousin's house. She thought that she saw Mr. Hunter's paternal grandmother drop Mr. Hunter off close by, and then believed that she saw Mr. Hunter walk by the Fernwood residence on the cut. About a minute later, her cousin informed her that she heard gunshots. They went outside and saw someone lying on the ground outside of Kelley's, while two employees of Kelley's stood near the body. After asking the Kelley's employees if they

needed assistance, Ms. Boswell began performing CPR on the man, and continued to do so until police officers arrived.

{¶13} On cross-examination, Ms. Boswell acknowledged that she had been drinking heavily on the date at issue, and she was so intoxicated on that day that she did not think her identification of Mr. Hunter was reliable.

{¶14} Responding officers testified that when they arrived at Kelley's, the victim, later identified as Mr. Suleiman, was lying in the parking lot, and he appeared to have an entry wound to his chest. Ms. Boswell was trying to assist him, and an officer took over administering CPR. The officers observed that Mr. Suleiman was lying in the parking lot near a green car, on which both front doors were open. The officers attempted to retrieve security camera footage from employees of Kelley's. However, the equipment was not working, and no footage was available. In the parking lot, the officers observed two shell casings, a cell phone, blood, and a spent bullet.

{¶15} Detective Mildred Morris testified that that she and her partner went to Kelley's to photograph and videotape the scene. The photographs and the video recording were admitted into evidence. Detective Morris also dusted the outside of the green car for latent finger prints, but the dusting only uncovered one partial print. Inside of the car, the detective photographed numerous items, including a hat, a beverage can, a beverage bottle, and a Nokia cell phone. The cell phone was located next to the crease in the seat and was partially covered by a $20 bill.

{¶16} Mr. Suleiman's brother testified that his brother had been driving his green Acura, and identified the Acura as the car officers photographed in the parking lot at Kelley's. He further testified that his brother had two cell phones, one of which was the phone discovered in the parking lot. On cross-examination, Mr. Suleiman's brother verified that Mr. Suleiman sold marijuana.

{¶17} Lisa Kohler, M.D., testified that she is the Summit County Medical Examiner. Dr. Kohler performed an autopsy on Mr. Suleiman. In her report, she described Mr. Suleiman as a "young white male of Arab descent[.]" She determined that the Mr. Suleiman's death was caused by a gunshot to the left chest, made from an intermediate range of up to two feet. Dr. Kohler recovered the bullet from the body. She also collected a DNA standard and fingernail clippings from Mr. Suleiman for testing.

{¶18} Forensic scientists from BCI and an employee of LabCorp testified as to their tests of the partial fingerprint lift, hat, bottle, can, fingernail clippings, and bullets recovered from the scene and the autopsy. They determined that both bullets were fired from the same firearm. The impressions contained on the cartridges, which are unique to the firearm used, were entered into the National Integrated Ballistic Information Network ("NIBIN"), which is a computerized database used by law enforcement to compare cartridge impressions in an attempt to match an impression to a gun used at other crime scenes. However, there was no match to a firearm for these cartridges in the NIBIN system. The partial fingerprint lift and the other items did not contain sufficient detail to be able to run a comparison on the lab's software. DNA on the hat, can, bottle, and fingernail clippings were consistent with Mr. Suleiman's DNA standard, except for one DNA profile located on the hat, which was not consistent with the DNA standards of Mr. Suleiman or Mr. Hunter.

{¶19} Detective James Pasheilich testified that he was the lead detective assigned to this case. Detective Pasheilich arranged for Detective Guy Sheffield of the police department's computer forensics unit to examine the cell phones found at the scene. In regard to Mr. Suleiman's telephone, Detective Sheffield copied screen shots of certain text messages sent and received by Mr. Suleiman from the day of the shooting. These messages were between Mr.

Suleiman and an individual utilizing a 480 area code, and listed in Mr. Suleiman's contacts as "Young Homie[.]" First, at 1:24 p.m., Young Homie sent a text to Mr. Suleiman stating: "My bad was stuk in traffic u n da hood[.]" Mr. Suleiman responded, "Nah will b later[.]" Later that afternoon, the two exchanged a series of texts between 4:59 and 5:07. First, Mr. Suleiman sent a text to Young Homie stating, "About to head back up my way..let me no I got a lil loud left[.]" Detective Pasheilich testified that "loud" is slang for marijuana. Young Homie then asks, "U at kellys," to which Mr. Suleiman replied, "I'm at the dairy mart were u at[.]" Young Homie then stated, "On madison on my way to kellys[.]" Mr. Suleiman replied "Me to[.]" Young Homie then stated, "Meet me at kellys[.]" Mr. Suleiman replied, "Yup I'm here[.]" Young Homie then sent the text "B there n 2mins[.]" Each of the text messages from Young Homie ended with the signature "$tackOr$tarve."

{¶20} Detective Sheffield testified that Detective Pasheilich also requested that he examine the Nokia cell phone found in Mr. Suleiman's car. An AT&T representative also testified in regard to the cell phone subscriber information. From the numbers and records provided, the detectives and the AT&T representative's testimony established that the cell phone recovered from the car was registered to Mr. Hunter's mother, Roxanne Ellerbe. The phone number for "Mom" as listed in the contacts section of the phone was also registered to Ms. Ellerbe. The phone number for "Granny" as listed on the phone was registered to Mr. Hunter's grandmother, Gladys Washington. On July 19, 2011, there is an outgoing text to "Granny" on the Nokia phone that reads: "granny is the funeral still going," and a reply from Granny stating "yes[.]"

{¶21} Detective Sheffield further testified as to several text messages sent between the Nokia phone and a contact in the phone named "Bezz," whose phone number is listed as the

same 480 number identified as that belonging to "Young Homie" on Mr. Suleiman's telephone. At 5:09, the Nokia phone received a text from Bezz which stated, "Wat up he on his way to kelly tare em up just hit me up wen u done[.]" A few seconds later, the Nokia phone user sent a text to Bezz asking "Wat kinda car[?]" Bezz replied at 5:11 stating, "Lil kia mazda look like its green and he were sun glases and long hair arab lite skin[.]" At 5:40 Bezz sent another message reading only "man u good[.]" At 5:47, the Nokia phone received two texts from Bezz stating, "Bro get to da east cut me n cal me asap," and, "Im on da east side on fulton[.]" In addition, all of text messages from "Bezz" end with "$tackOr$tarve."

{¶22} Tasha Thomas testified that a friend of hers named Sandy, and Sandy's boyfriend, who she knew as "Bezel," but whose actual name was Alan Lollis, were staying at her house during the summer of 2011. Ms. Thomas testified that Mr. Lollis had spoken with her about a "robbery gone bad" at Kelley's. During her testimony, Ms. Thomas indicated that Mr. Lollis had told her what he heard from the streets about the robbery. However, she could not remember much about the conversation. The State asked if it would refresh her recollection to listen to recorded interviews she had with Detective Pasheilich, and she replied that it would. Ms. Thomas then listened to the recordings in chambers, out of hearing of the jury. She then testified that Mr. Lollis informed her that he had set up a robbery at Kelley's targeting "[s]ome Arab[.]" Mr. Lollis explained to her that he was "texting some dude telling him what the dude in the car had on, what kind of car he was driving." Ms. Thomas showed the detective the number for Alan Lollis that she had saved in her cell phone, and it matched the number of "Young Homie" and "Bezz[.]" She further testified that when she received texts from Mr. Lollis, the signature line of the text would read "stack or starve."

{¶23} On cross-examination, Ms. Thomas acknowledged that she had told defense counsel that she was going to testify as to what Mr. Lollis had said that "he had heard on the streets[.]" However, after listening to her recorded interview, she remembered that the information provided by Mr. Lollis was not what he had heard on the streets, but was his direct account of the events. Ms. Thomas further testified that she was angry with Mr. Lollis when she was interviewed because she believed he had stolen from her. Also, Ms. Thomas confirmed that she has several theft convictions, but she maintained that she was an honest person. Further, she acknowledged that when she spoke with Mr. Lollis about the incident at Kelley's, they were both high on marijuana.

{¶24} The defense called Ms. Ellerbe and Ms. Washington as witnesses. Both witnesses testified that Mr. Hunter habitually loses items, including his cell phones. On the date at issue, Ms. Ellerbe and Ms. Washington were at a funeral. Ms. Ellerbe affirmed that her son's phone number was the same as the number associated with the Nokia phone recovered from the scene. However, she maintained that he had lost that phone at some point. Ms. Washington acknowledged that Mr. Hunter probably sent her a text message around 1:00 p.m. on July 19, 2011, asking if she was still at the funeral. Ms. Washington maintained that while she was at the funeral, her car was at the home of the deceased, and she had the only set of keys with her. Ms. Washington estimated that she was at the funeral from approximately noon until 4:00 p.m. that day, and then she returned to the home of the deceased, where she stayed for about another hour. Therefore, Ms. Washington's own testimony established that she was finished with the funeral proceedings at approximately 5:00 p.m., just prior to when Mr. Hunter was alleged to have shot Mr. Suleiman. However, Ms. Washington maintained that she did not give Mr. Hunter a ride anywhere that day.

{¶25} Mr. Hunter maintains that his convictions were against the weight of the evidence because there "was no eyewitness testimony, no photographs, no video tapes and no other tangible evidence proving" that he was involved in the shooting death of Mr. Suleiman. Further, he argues that there was no gun recovered from the scene and no direct evidence that he had a gun on the date of the shooting. He also argues that there was no physical evidence, such as fingerprints or DNA, linking him to the scene. Lastly, he maintains that the testimony of Ms. Boswell and Ms. Thomas was not credible, and the presence of his cellular phone in Mr. Suleiman's car alone could not be used to link him to the scene.

{¶26} Although Mr. Hunter maintains that he had lost his cell phone, the telephone records authenticated by Detective Sheffield provide a text message from Mr. Hunter's phone at 1:08 p.m. on this date sent to his grandmother, in which he asked if she was still at the funeral, and Ms. Washington affirmed that she likely received this text from Mr. Hunter. From this a jury could infer that, as of the date of the incident, Mr. Hunter had not lost his cell phone. A reasonable inference arises from the later text messages between Mr. Hunter and "Bezz," that they planned to violently rob Mr. Suleiman on the afternoon at issue. Further, Mr. Hunter's aunt saw Mr. Hunter walk toward Kelley's approximately one minute before shots were fired. This circumstantial evidence indicates that Mr. Hunter, using a firearm, attempted a theft offense against Mr. Suleiman, resulting in Mr. Suleiman's shooting death. Although the evidence against Mr. Hunter is circumstantial, "[c]ircumstantial evidence and direct evidence inherently possess the same probative value." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus.

{¶27} In regard to Ms. Boswell's testimony, Mr. Hunter points out that Ms. Boswell had admittedly been drinking heavily, and to such an extent that she did not believe she could

positively identify Mr. Hunter as the individual that she saw walking on the cut. She further did not testify as to hearing any gunshots herself, although, when she spoke with police officers she indicated she heard five shots. Further, she testified that Mr. Hunter's grandmother dropped him off nearby, but Ms. Washington testified that she did not give Mr. Hunter a ride that day. In regard to Ms. Thomas' testimony, Mr. Hunter maintains she was not credible because she was angry with Mr. Lollis when she was interviewed by police, she was convicted of multiple felonies for theft, and she was smoking marijuana with Mr. Lollis when the conversation to which she testified took place.

**{¶28}** Although we recognize the potential credibility issues to which Mr. Hunter cites, through cross-examination, the jury was aware of these issues. We are mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." (Citations omitted.) *State v. Winchester*, 9th Dist. Summit No. 26552, 2013-Ohio-4683, ¶ 4. In doing so, "[t]he jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35, citing *State v. Jackson*, 86 Ohio App.3d 29, 33 (4th Dist.1993). This is because the jury "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993).

**{¶29}** After a review of the record, we cannot say that this is the extraordinary case where the jury clearly lost its way in finding Mr. Hunter guilty of these charges. Accordingly, Mr. Hunter's first and second assignments of error are overruled.

**ASSIGNMENT OF ERROR III**

THE COURT ERRED AND/OR ABUSED ITS DISCRETION IN NOT ADDING THE REQUESTED JURY INSTRUCTIONS BY MR. HUNTER'S COUNSEL.

{¶30} In his third assignment of error, Mr. Hunter maintains that the trial court erred by failing to include certain instructions, as requested by his counsel. We disagree.

{¶31} First, we note that the transcript submitted does not include the instructions to the jury. However, the trial court's discussion with counsel regarding the instructions is contained in the transcript, and written instructions are included with the exhibits. *See State v. Cadle*, 9th Dist. Summit No. 24064, 2008-Ohio-3639, ¶ 13 (noting that the better practice is to provide a transcript of the instructions instead of only supplying written instructions contained in the record). With this observation made, we will proceed to review Mr. Hunter's assignment of error.

{¶32} "A defendant is entitled to have his instructions included in the charge to the jury only when they are a correct statement of the law, pertinent and not included in substance in the general charge." *State v. Frazier*, 9th Dist. Summit No. 25338, 2011-Ohio-3189, ¶ 17, quoting *State v. Theuring*, 46 Ohio App.3d 152, 154 (1st Dist.1988). "This Court reviews a trial court's decision to give or not give jury instructions for an abuse of discretion under the particular facts and circumstances of the case." *State v. Calise*, 9th Dist. Summit No. 26027, 2012-Ohio-4797, ¶ 68, citing *State v. Sanders*, 9th Dist. Summit No. 24654, 2009-Ohio-5537, ¶ 45.

{¶33} Here, defense counsel requested the trial court to instruct the jury, in judging credibility of witnesses, that the crimes of theft and receiving stolen property are crimes of dishonesty. The court declined to do so, noting it would be "awkward" to add in this instruction.

Defense counsel further requested an instruction that mere presence in the place of a crime does not make one guilty of a crime.

{¶34} After reviewing the instructions as a whole, we conclude that the trial court did not commit error in failing to add the instructions requested. Pursuant to Evid.R. 609(A)(3), all convictions for "crime[s] involv[ing] dishonesty or false statement, regardless of the punishment," are admissible for purposes of impeaching witnesses. Therefore, testimony as to Ms. Thomas' convictions for theft and receiving stolen property, which are characterized as crimes of dishonesty, was admissible under Evid.R. 609(A)(3). *See State v. Johnson*, 10 Ohio App.3d 14, 16 (10th Dist.1983) (concluding theft was inherently a dishonest act as common sense dictates that stealing is dishonest), and *State v. Taliaferro*, 2 Ohio App.3d 405, 406 (10th Dist.1981), (determining that receiving stolen property is an offense involving dishonesty). However, Mr. Hunter cites to no authority supporting the proposition that the court must inform the jury as to the legal basis underlying the admissibility of the testimony. Further, although the trial court did not instruct the jury specifically as requested by defense counsel, it did instruct the jury that, in judging credibility, the jurors were to apply the tests of truthfulness that they apply in their daily lives, including the witness' prior criminal record. Therefore, this instruction was included in substance in the general charge. *See Frazier* at ¶ 17.

{¶35} In regard to the instruction regarding mere presence, we note that the written instructions reflect that the jury was instructed as requested by defense counsel that mere presence at the scene of a crime does not make a person complicit *or guilty* of an offense. Therefore, Mr. Hunter's argument as to this instruction lacks merit. Accordingly, the trial court did not abuse its discretion in failing to give the instructions as requested by defense counsel, and Mr. Hunter's third assignment of error is overruled.

## ASSIGNMENT OF ERROR IV

[MR.] HUNTER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BECAUSE HIS COUNSEL FAILED TO INVESTIGATE AND DEFEND THE CASE BY PROPERLY CHALLENGING THE STATE'S EVIDENCE AND PRESENTING EVIDENCE ON BEHALF OF MR. HUNTER.

{¶36} In his fourth assignment of error, Mr. Hunter argues that his counsel was ineffective for failing to properly challenge the State's evidence and for failing to present evidence on behalf of Mr. Hunter. We disagree.

{¶37} This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial[.]" *Strickland* at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689.

{¶38} In support of his fourth assignment of error, Mr. Hunter first maintains that his trial counsel was ineffective for failing to object to pictures of Ms. Boswell's cousin's house, as he maintains that her testimony was inconsistent with what is displayed in the pictures. However, we cannot discern on what basis Mr. Hunter maintains that trial counsel should have objected to the admission of the photographs. Instead, this argument seems predicated on the idea that Ms. Boswell's testimony was not credible, which speaks to the weight of the evidence and not its admissibility.

{¶39} Mr. Hunter further argues that trial counsel was ineffective for failing to introduce pictures from the window of Ms. Boswell's cousin's house, which would have established that it would not have been possible to identify a person walking through the cut from the picture window of the residence. However, because such pictures are not included in the record before us, we are unable to review this portion of Mr. Hunter's assignment of error. *See State v. Zupancic*, 9th Dist. Wayne No. 12CA0065, 2013-Ohio-3072, ¶ 4 ("When affidavits or other proof outside the record are necessary to support an ineffective assistance claim, * * * it is not appropriate for consideration on direct appeal.").

{¶40} Accordingly, Mr. Hunter's fourth assignment of error is overruled.

### ASSIGNMENT OF ERROR V

COUNSEL'S FAILURE TO OBJECT TO THE PLAYING OF TASHA THOMAS'[ ]INTERVIEW WITH DETECTIVE P[ASHEILI]CH AS A PRIOR CONSISTENT STATEMENT WAS INEFFECTIVE ASSISTANCE OF COUNSEL AND/OR PLAIN ERROR.

{¶41} In his fifth assignment of error, Mr. Hunter argues that the trial court erred in allowing a recorded interview between Ms. Thomas and Detective Pasheilich to be played to the jury, as it was hearsay. We disagree.

{¶42} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Pursuant to Evid.R. 802, hearsay is generally not admissible.

{¶43} Evid.R. 801(D)(1)(b) provides that a prior statement is not hearsay if all of the following elements apply:

> The declarant testifies at trial * * * and is subject to cross-examination concerning the statement, and the statement is * * * consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive[.]

The consistent statements that the offering party seeks to introduce in order to rehabilitate its witness must have been made "prior to the emergence of the improper influence or motive" to fall within the scope of Evid.R. 801(D)(1)(b). *State v. Edwards*, 9th Dist. Lorain No. 97CA006775, 1999 WL 548963, *3 (July 28, 1999).

{¶44} Here, during Ms. Thomas' testimony, the State asked if it would help her recollection of her discussion with Mr. Lollis if she were to hear again her interview with Detective Pasheilich. She said that it would, and she listened to the interview in chambers, outside of the presence of the jury. She then testified consistently with her statement given to the detective. She maintained that Mr. Lollis told her that he had planned a robbery that had gone bad at Kelley's, that he had been texting another individual details of Mr. Suleiman's appearance and car in order to effectuate the robbery, and the other individual dropped his phone during the commission of the offense. During cross-examination, defense counsel questioned Ms. Thomas regarding her indication to defense counsel earlier that day that she would be testifying as to what Mr. Lollis "heard on the streets[.]" Ms. Thomas acknowledged that she had indicated to counsel that would be her testimony, but, after hearing the recording of her interview, she remembered that Mr. Lollis was not telling her what he heard on the street; rather he was telling her directly what had transpired. Defense counsel questioned Ms. Thomas about how many nights she had spent in jail on a material witness warrant.

{¶45} Later, the State indicated to the court that it intended on playing Ms. Thomas' interview with Detective Pasheilich to the jury during the detective's testimony, as it constituted a prior consistent statement excluded from the definition of hearsay. Mr. Lollis' counsel made an oral motion in limine to exclude the tape. The trial court denied the motion. During Mr.

Pasheilich's testimony, Mr. Lollis' counsel objected to the playing of the recording, but Mr. Hunter's counsel made no objection.

{¶46}    As stated in his assignment of error, Mr. Hunter maintains that the playing of the recording to the jury either resulted from ineffective assistance of counsel "and/or" constituted plain error.  However, Mr. Hunter has not developed a supporting argument that counsel was ineffective in regard to the playing of the interview for the jury.  Therefore, we will limit our review to Mr. Hunter's argument that the playing of the interview constituted plain error.

{¶47}    Pursuant to Crim.R. 52(B), a plain error or defect that affects a substantial right may be noticed although it was not brought to the attention of the trial court.  "A plain error must be obvious on the record, such that it should have been apparent to the trial court without objection." *State v. Kobelka*, 9th Dist. Lorain No. 01CA007808, 2001 WL 1379440, *2 (Nov. 7, 2001).  As notice of plain error is to be taken with utmost caution and only to prevent a manifest miscarriage of justice, the decision of a trial court will not be reversed due to plain error unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error. *Kobelka* at *2, citing *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996), and *State v. Phillips*, 74 Ohio St.3d 72, 83 (1995).

{¶48}  Our review of the record indicates that, during cross-examination, defense counsel asked Ms. Thomas if she had been in jail since last Friday, which would have amounted to three nights in jail.  Ms. Thomas affirmed that she had been.  Defense counsel further asked whether she was taken into custody because she had indicated to the prosecutor that she did not want to testify.  She affirmed that she had been.  We read these questions, when combined with Ms. Thomas' acknowledgment that she had told defense counsel that her testimony would pertain to only what Mr. Lollis said he had heard on the streets, to implicitly charge Ms. Thomas with a

recent fabrication. *See* Evid.R. 801(D)(1)(b). Accordingly, we see no plain error in the trial court allowing her recorded statement to be played to the jury, and Mr. Hunter's fifth assignment of error is overruled.

## III.

**{¶49}** Mr. Hunter's assignments of error are overruled. The judgment of the trial court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

CARLA MOORE
FOR THE COURT

BELFANCE, J.
WHITMORE, J.
CONCUR.


APPEARANCES:

RONALD T. GATTS, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.