[Cite as *State v. Winchester*, 2013-Ohio-4683.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 26652 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| JAMES J. WINCHESTER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 12 04 0958 |

DECISION AND JOURNAL ENTRY

Dated: October 23, 2013

MOORE, Presiding Judge.

{¶1}  Defendant, James J. Winchester, appeals from the judgment of the Summit County Court of Common Pleas.  This Court affirms.

I.

{¶2}  On May 18, 2012, the Summit County Grand Jury indicted Mr. Winchester on one count of rape in violation of R.C. 2907.02(A)(2) and one count of kidnapping in violation of R.C. 2905.01(A)(2)/(3)/(4).  At his arraignment, Mr. Winchester pleaded not guilty, and the case proceeded to a jury trial.  The jury found Mr. Winchester guilty on both counts.  The trial court sentenced him to a total of eighteen years of incarceration.  Mr. Winchester timely filed a notice of appeal and raises four assignments of error for our review.  We have re-ordered the assignments of error to facilitate our discussion.

II.

**<u>ASSIGNMENT OF ERROR IV</u>**

[MR. WINCHESTER]'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN VIOLATION OF THE FIFTH AND FOURTEENTH AM[E]NDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS TEN AND SIXTEEN OF THE OHIO CONSTITUTION.

{¶3} In his fourth assignment of error, Mr. Winchester argues that his rape and kidnapping convictions are against the manifest weight of the evidence. We disagree.

{¶4} When a defendant asserts that his conviction is against the manifest weight of the evidence:

[A]n appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). In making this determination, this Court is mindful that "[e]valuating evidence and assessing credibility are primarily for the trier of fact." *State v. Shue*, 97 Ohio App.3d 459, 466 (9th Dist.1994), citing *Ostendorf-Morris Co. v. Slyman*, 6 Ohio App.3d 46, 47 (8th Dist.1982) and *Crull v. Maple Park Body Shop*, 36 Ohio App.3d 153, 154 (12th Dist.1987).

{¶5} Here, Mr. Winchester was convicted of rape in violation of R.C. 2907.02(A)(2) and kidnapping in violation of R.C. 2905.01(A)(2)/(3)/(4). R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2901.01(A) defines "force" as "any violence, compulsion or constraint physically exerted by any means upon or against a person or thing."

**{¶6}** R.C. 2905.01(A) provides in relevant part:

(A) No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter;

(3) To terrorize, or to inflict serious physical harm on the victim or another;

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

**{¶7}** Here, the charges against Mr. Winchester stem from the alleged kidnapping and rape of a then seventeen-year-old girl, L.L. On appeal, Mr. Winchester maintains that the weight of the evidence does not support that he kidnapped and raped L.L., but, instead it demonstrates that he and L.L. engaged in consensual sexual conduct on the night at issue. We will therefore limit our discussion of the evidence to that which pertains to the issues of kidnapping and consent as a defense to rape.

**{¶8}** As part of its case-in-chief, the State presented the testimony of L.L., L.L.'s grandmother, a sexual assault nurse examiner, officers from the Akron Police Department, and Mr. Winchester's former girlfriend, Precious Allen. L.L. testified that, in the late hours of July 17, 2012, she was walking along Copley Road in Akron, heading home from a friend's house. While she was walking, two men, whom she did not know but had previously seen in the neighborhood, pulled up next to her in a sports utility vehicle and told her to get in. She said no, and she kept walking. However, the car then stopped, and a man wearing a square earring and "gold teeth," whom she later identified as Mr. Winchester, got out of the car and told her to get in. She complied because she was scared. They then drove to a house, where the passenger got out of the car. After the passenger went into the house, Mr. Winchester told L.L. to get out of

the backseat of the car. As they stood outside of the car, Mr. Winchester began touching her thighs underneath her dress. He then told her to get into the front passenger seat. L.L. complied because she was still scared. Mr. Winchester then drove down a street near Buchtel High School. He began touching her again. Mr. Winchester stopped the car, got out, walked to the passenger side, and opened the door and tried to kiss her. She bit his lip. He then pulled her out of the car, and they began wrestling. As the struggle ensued, L.L. found herself at the front of the car, and Mr. Winchester began banging her head on the car by forcing her head down while holding the back of her neck. She told him to stop, but every time she did, he would bang her head on the car. At this point, L.L.'s back was facing Mr. Winchester, and she was facing the front of the car. He then put his penis in her vagina. She told him to stop, and he refused. She eventually stopped resisting because every time she struggled, he hit her head against the car. Thereafter, she got back in the truck, and Mr. Winchester drove her to her grandmother's home. She went in the bathroom of grandmother's home, where she was crying and shaking. At some point, her grandmother came in, and she relayed to her grandmother what had happened.

{¶9} On cross-examination, L.L. confirmed that she owns a cell phone; however, she could not recall if she had it in her possession on the night at issue. L.L. further indicated that she would not normally walk home, but it was around midnight, and she was supposed to have already been home. L.L. maintained that she got in the car when Mr. Winchester told her to because she was scared. He did not throw her in the car, he did not threaten her, and she saw no weapon in his possession. After they dropped off the passenger, L.L. got out of the backseat through the backseat door, opened the front passenger seat door, and got back into the car. When they stopped the second time, which was at a house on Packard Drive, Mr. Winchester pulled her out of the car by her wrists, and she tried to run, but she could not get away. L.L. further

acknowledged that, although she had seen Mr. Winchester previous to the attack, she did not know him or his sister, he did not father her child who was born previous to the attack in December of 2010, and she had never been to his home. After the attack, she asked him to take her home, and she showed him which way to go until they were almost there, at which point she told him to stop, and she got out of the car and walked the rest of the way. L.L. recalled that she had bruises on her neck and right upper arm as a result of the attack, but she did not have any bruising on her face resulting from Mr. Winchester slamming her head into the car.

{¶10} L.L.'s grandmother testified that, during the night at issue, she awoke upon hearing L.L. crying. She found L.L. curled in the fetal position on the bathroom floor. After L.L. had explained the attack, her grandmother called the police and the paramedics. L.L. was then taken to the hospital, where she was given a sexual assault exam. On cross-examination, L.L.'s grandmother indicated that she had never seen Mr. Winchester or heard his name prior to the instant proceedings.

{¶11} Jennifer Diamond, a sexual assault nurse examiner, testified that she examined L.L. at the hospital. Ms. Diamond obtained a narrative from L.L., who was shaking and crying. L.L. told the nurse that she was walking home from a friend's house when two men approached her in a car and asked if she needed a ride. L.L. said she did not, but then "one of them jumped out and threw her into the car." The men then drove to a home to drop off the man in the passenger seat, "[a]nd at that point [L.L.] was begging for them to let her go. But after the passenger got out of the car * * * the driver told her to get into the passenger's seat[.]" He then began to touch her all over her body, and she asked him to stop. He responded that he was going to take her somewhere "where no one could see." He drove her to a house near Buchtel High School and parked in the driveway. He then "threw" her out of the car and "pushed" her up

against the car. She was fighting and screaming to get away from him. He tried to kick her and was covering her mouth. He then "grabbed her in the back of her neck and pushed her * * * face first against the front of the car." He pinned her wrists behind her back and put his penis and fingers into her vagina. He then drove her home, called her a "bitch," and told her to get out. L.L. indicated that she did not know her attacker, but she had seen him before.

{¶12} After taking L.L.'s narrative, Ms. Diamond performed a physical exam on L.L. and collected samples for a sexual assault kit.[1] Ms. Diamond noted abrasions on L.L.'s sternum and breast. She also noted multiple reddened contusions on her left and right wrists and abrasions on her labia. Ms. Diamond photographed the injuries, and these pictures were submitted into evidence.

{¶13} On cross-examination, Ms. Diamond indicated that the injuries she observed were consistent with the history that L.L. provided. However, the abrasions to her vagina also could have been consistent with consensual sex. Ms. Diamond did not recall or document any injuries to L.L.'s head or face.

{¶14} Officer Mathew Hackathorn testified that he responded to the hospital in response to the report of rape. L.L. informed the officer that she did not know who her attacker was, but gave a description of the man to the officer. Her description included that the man was wearing a square earring and a blue "do-rag." The officer then notified the detective bureau. On cross-

---

[1] Forensic scientists from the Ohio Bureau of Criminal Investigation testified that they received the samples collected from the sexual assault kit. These samples were positive for seminal fluid, and contained DNA which was later matched to Mr. Winchester. Mr. Winchester does not dispute these findings.

examination, Officer Hackathorn indicated that he believed that L.L. had said that, previous to this incident, she had seen her attacker on the west side of Akron, but she did not know who he was.

{¶15} Detective Crystal Bowen Carter of the Akron Police Department testified that she received the police report alleging that L.L. had been raped, and she also received a report from the hospital on July 18, 2011. As part of her investigation, she spoke with L.L. that day. When L.L. arrived at the police station, the detective could see injuries on L.L.'s upper arms, which L.L. indicated she received during the attack. L.L. explained to the detective that she did not know the identity of her attacker, but gave the officer a physical description of the man and a description of the car. The description included that he had a "square earring, a do-rag, [and] a grill[.]" Detective Bowen Carter then placed a "be on the lookout" alert ("BOLO") for a man or vehicle matching the description. However, when nothing came in as a result of the BOLO, Detective Bowen Carter sent the sexual assault kit to BCI for testing. She later learned that the DNA collected in the samples in the kit matched the DNA of Mr. Winchester.

{¶16} On cross-examination, Detective Bowen Carter maintained that she did not photograph the injuries that she observed to L.L.'s arms, because she believed that the hospital had already photographed the injuries. Detective Bowen Carter further acknowledged that, in L.L.'s statement to her, she reported that the driver of the car got out of the car, "grabbed her right wrist," and demanded that she get in the car. L.L. reported that they then dropped off the male passenger at a house on Thornton Street, at which point her attacker pulled her out of the car and pushed her against it. However, the lights in the passenger's house came on, and her attacker said that "he wasn't going to do it right there because his friend was watching him."

The detective confirmed that she did not ask L.L. why she did not attempt to run while she was out of the vehicle.

{¶17} Precious Allen testified that she has a child with Mr. Winchester. In July of 2011, Mr. Winchester was residing with her. She recalled that, one night in July, at approximately 2:00 a.m., he came home with his t-shirt ripped and his rosary necklace broken. At that time, he was wearing square earrings and a gold "grill," and he had a "do-rag" on his head. Ms. Allen asked him what had happened, but he would not tell her. On April 12, 2012, Mr. Winchester called her from jail and told her that he needed her to say that he was with her on July 17, 2011.

{¶18} On cross-examination, Ms. Allen acknowledged that she could not remember the exact date that Mr. Winchester had come home with his t-shirt ripped and his necklace broken; although she did know that it was late at night in July of 2011. Further, she remembered in the phone call from Mr. Winchester that he told her to tell the truth. She further acknowledged that she was upset with Mr. Winchester due to the difficulties in their relationship.

{¶19} The defense provided the testimony of Kiana Winchester, Mr. Winchester's sister. Ms. Winchester testified that she knows L.L., and she knew L.L. when she was pregnant. At that time, she had come to Ms. Winchester's house to braid Mr. Winchester's hair. After L.L. had her baby, she came back to Ms. Winchester's house to again braid Mr. Winchester's hair. While she was there, Ms. Winchester asked if she could see a picture of L.L.'s baby, and she showed her a picture on a social media website. On the night of the purported attack, Ms. Winchester saw Mr. Winchester pull into their driveway, and she could see a female in the front seat, but she could not see her face. On cross-examination, Ms. Winchester acknowledged that her brother had sent her a letter while he was incarcerated awaiting trial, but she maintained that she had thrown the letter away.

**{¶20}** In his merit brief, Mr. Winchester argues that his convictions were against the manifest weight of the evidence because L.L.'s statements to Ms. Diamond and Detective Bowen Carter were inconsistent with each other and inconsistent with the testimony that she provided at trial.

**{¶21}** Although L.L.'s testimony was at times inconsistent with the accounts of the incident when compared to the accounts that other witnesses had recalled her previously providing, "[t]he jury is free to believe all, part, or none of the testimony of each witness." *Prince v. Jordan*, 9th Dist. Lorain No. 04CA008423, 2004-Ohio-7184, ¶ 35, citing *State v. Jackson*, 86 Ohio App.3d 29, 33 (4th Dist.1993). This is because the jury "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. Summit No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). We cannot say the jury's resolution of the inconsistencies was unreasonable. *See State v. Peasley*, 9th Dist. Summit No. 25062, 2010-Ohio-4333, ¶ 18 ("A conviction is not against the manifest weight because the [trier of fact] chose to credit the State's version of events.").

**{¶22}** After reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice in finding Mr. Winchester guilty of rape and kidnapping. Accordingly, Mr. Winchester's fourth assignment of error is overruled.

## ASSIGNMENT OF ERROR II

[MR. WINCHESTER] WAS DENIED DUE PROCESS OF LAW, PURSUANT TO THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION SIXTEEN OF THE OHIO CONSTITUTION, WHEN COUNSEL WAS NOT PERMITTED TO QUESTION THE COMPLAINING WITNESS'S MOTIVES IN HIS CLOSING ARGUMENT.

{¶23} In his second assignment of error, Mr. Winchester argues that the trial court erred in denying him the opportunity to argue in closing arguments that L.L. fabricated her testimony because she feared that criminal charges would be brought against her if she failed to maintain her story. We disagree.

{¶24} "The assessment of whether the permissible bounds of closing argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. Such determination will not be reversed on appeal absent an abuse of discretion." *Pang v. Minch*, 53 Ohio St.3d 186 (1990), paragraph three of the syllabus. An abuse of discretion implies that a trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983)

{¶25} Here, during closing argument, the following exchange occurred:

[DEFENSE COUNSEL]: * * *

[L.L.] has done everything in her power to not have to have this case go forward. She is caught. She has no other alternative. If she backs out now they charge her with making –

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: Why?

THE COURT: Sustained.

You may continue.

[DEFENSE COUNSEL]: Okay.

She's trapped and has no other options but to go forward with this. She does her best not to show up. She does her best to avoid this in hopes that this whole thing will just go away. She realizes she is in over her head.

**{¶26}** Mr. Winchester maintains that, prior to the State's objection, defense counsel was prepared to indicate that L.L. fabricated her story and then maintained her lie in order to avoid criminal prosecution. Mr. Winchester argues that the trial court erred in sustaining the objection to this line of argument. In support, he cites to the Fourth District's holding in *State v. Powell*, 177 Ohio App.3d 825, 2008-Ohio-4171 (4th Dist.2008).

**{¶27}** In *Powell*, the defendant was charged with complicity to escape for purportedly helping her friend escape the custody of an officer who had just arrested him. *Id.* at ¶ 1, 3. During trial, the court "admitted into evidence most of the officer's method of maintaining her friend's detention." *Id.* at ¶ 43. During closing argument, the trial court prohibited defense counsel from arguing that that the "officer's poor method of or mistakes in detaining her friend led to his motive to lie or exaggerate what happened." *Id.* at ¶ 17, 43. The defendant was convicted, and she appealed. *Id.* at ¶ 18-19. The Fourth District reversed the conviction and remanded the matter, holding, in relevant part:

> [T]he trial court should accord trial counsel wide latitude in closing arguments. Trial counsel should advocate and persuade to the limit of his or her ability and enthusiasm *but cannot misrepresent evidence* or go beyond the limits set by the trial court. Thus, counsel may freely discuss the facts, arraign the conduct of the parties, impugn, excuse, justify or condemn motives *according to the evidence*, and attack the credibility of witnesses when the record supports the same. The court should not be severe in arresting argument on grounds that the argument or inference is illogical.

(Emphasis added.) (Internal citations omitted.) *Id.* at ¶ 45.

**{¶28}** Here, during cross-examination of L.L., defense counsel questioned her as whether she had missed appointments with Detective Bowen Carter, and L.L. maintained that

she did not know what defense counsel was asking about. During cross-examination of Detective Bowen Carter, the detective maintained that, although L.L. missed several scheduled meetings, she did so because she did not have transportation. Therefore, the detective went to L.L.'s home to meet with her. Detective Bowen Carter specifically stated that L.L. was not uncooperative.

{¶29} In *Powell*, the Fourth District concluded that defense counsel was prevented from arguing inferences pertaining to motive that arose from the *facts in evidence* pertaining to the officer's methods of detaining the defendant's friend. *Id.* at ¶ 43-45. However, here, there was no indication in the record that law enforcement considered bringing charges against L.L., much less that law enforcement communicated to L.L an intent to do so. Therefore, there was no evidence from which it arguably could be inferred that L.L. would be motivated to maintain a fabricated story. *See State v. Harris*, 8th Dist. Cuyahoga No. 54700, 1989 WL 24922, *2 (Mar. 16, 1989) ("parties may not comment upon the inferences to be drawn from facts not in evidence").

{¶30} Accordingly, the trial court did not abuse its discretion in sustaining the State's objection, and Mr. Winchester's second assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED WHEN IT IMPOSED CONSECUTIVE SENTENCES FOR KIDNAPPING AND RAPE, IN VIOLATION OF THE DOUBLE JEOPARDY CLAUSES OF THE OHIO AND UNITED STATES CONSTITUTIONS, *STATE V. JOHNSON*, AND SECTION 2941.25 OF THE OHIO REVISED CODE.

{¶31} In his third assignment of error, Mr. Winchester argues that the trial court erred by failing to merge his convictions for rape and kidnapping because these offenses were allied offenses of similar import. We disagree.

**{¶32}** R.C. 2941.25 provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶33}** This statute "codifies the protections of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, which prohibits multiple punishments for the same offenses." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 13, quoting *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 23.

**{¶34}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 44, the Ohio Supreme Court held that, in determining whether two offenses are allied offenses of similar import, "the conduct of the accused must be considered." The court must first determine "whether it is possible to commit one offense and commit the other with the same conduct," and, if so, then "the court must determine whether the offenses were committed by the same conduct, i.e. 'a single act, committed with a single state of mind.'" *Id.* at ¶ 48, 49, quoting *State v. Brown*, 119 Ohio St. 447, 2008-Ohio-4569, ¶ 50 (Lanzinger, J. concurring). If the same conduct constituted both offenses, then they must be merged. *Johnson* at ¶ 50. We conduct the review of whether the sentences were subject to merger de novo. *Williams* at ¶ 1.

**{¶35}** In considering this issue here, the trial court determined:

As to the allied offense, I can envision where the kidnapping and rape could occur – I think a kidnapping is always going to be involved in a rape or certainly could oftentimes when somebody is restrained. So the further analysis on Johnson is whether or not these are separate acts and a separate animus.

And as I recall the testimony, this was a young lady walking home at approximately two a.m. in the morning to a relative's home. The testimony was that she was forced into a vehicle and drive to a – by two men after being forced into the vehicle and drive to a home. The passenger got out and went into the house.

The testimony was that the victim was forced out of the truck and sexually assaulted. That the defendant moved her to a separate location after forcing her back into the truck at which time the victim testified he pulled into a driveway of an unoccupied home, backed into the driveway, deep into the driveway where the rape occurred.

So given those facts the court finds there were separate acts and a separate animus of the kidnapping, forcing her into the car and the rape and taking her to a different location and committing the act of rape.

**{¶36}** In regard to the first merger issue of whether "it is possible" to commit a rape and a kidnapping "with the same conduct," we agree with the trial court, and the State concedes, that it is. *See Johnson* at ¶ 48, 49. As Justice O'Donnell explained in a concurring opinion in *Johnson*,

Consider the crimes of rape and kidnapping, for example. The elements of each are different. Rape, as defined in R.C. 2907.02(A)(2), is committed when a defendant engages in sexual conduct with another and the defendant purposefully compels the other person to submit by force or threat of force. Kidnapping, as defined in R.C. 2905.01(A)(4), is committed when by force, threat, or deception, * * * a defendant removes another from the place where the other person is found or restrains the liberty of the other with the purpose to engage in sexual activity with the victim against the victim's will.

Inevitably, every rapist necessarily kidnaps the victim, because the conduct of engaging in sexual conduct by force results in a restraint of the victim's liberty. Thus, in those circumstances, the conduct of the defendant can be construed to constitute two offenses—rape and kidnapping—and an indictment may contain counts for each, but the defendant may be convicted of only one.

In a different factual situation, however, if the [S]tate presented evidence that a defendant lured a victim to his home by deception, for example, and then raped that victim, an indictment may contain separate counts for the rape and for the kidnapping. In this hypothetical, *different conduct*—the luring of the victim by deception and the separate act of rape—*results in two offenses being committed separately; therefore, the indictments may contain counts for both offenses and the defendant may be convicted of both. See, e.g., State v. Ware*, 63 Ohio St.2d 84

(1980) (the defendant could be convicted of both kidnapping and rape because he
lured the victim to his home by deception before raping her).

(Emphasis added.) (Footnotes omitted.) *Johnson* at ¶ 79-81 (O'Donnell, J. concurring in judgment and syllabus). Therefore, we turn to the second issue of merger, that of whether the offenses were committed by the same conduct. *Johnson* at ¶ 48, 49.

{¶37} It is not clear from the indictment which acts the State intended to prove as constituting the kidnapping. *See e.g. State v. Harmon*, 9th Dist. Summit No. 26502, 2013-Ohio-1769, ¶ 24 (noting that, "[b]ecause the State did not define in the indictment or at trial the conduct that it believed constituted the kidnapping * * *, it is impossible to say for certain what conduct the jury concluded constituted the kidnapping"). Instead, the indictment alleged that Mr. Winchester "by force, threat, or deception, [did] remove and/or restrain the liberty of L.L. * * * for the purpose of facilitating the commission of any felony or flight thereafter and[/]or terrorizing, or to inflict serious physical harm on the victim or another and/or engaging in sexual activity, as defined in section 2907.01 of the Ohio Revised Code, with the victim against the victim's will in violation of Section R.C. 2905.01(A)(2)/(3)/(4) of the Ohio Revised Code[.]" However, it appears from the record that the State's theory of kidnapping was based upon the actions of Mr. Winchester in regard to allegedly forcing L.L. into the car while she was walking down the street. In its opening statement, the State maintained that the evidence would show that, after L.L. declined a ride from Mr. Winchester, he stopped the car, got out, grabbed her and forced her into the vehicle. In closing argument, the State referenced the kidnapping as having occurred prior to Mr. Winchester dropping off his passenger. The evidence of L.L.'s statements to the sexual assault nurse examiner, Ms. Diamond, when receiving medical treatment, supported this theory of the case. Ms. Diamond testified that L.L. had stated that her attacker "threw" her into the car after she declined his offer of a ride.

**{¶38}** Thus, we must determine whether these facts support a kidnapping which occurred by different conduct than that which constituted the rape. In *Williams* at ¶ 23, the Supreme Court referenced "guidelines to determine whether kidnapping and rape are committed with a separate animus so as to permit separate punishment". Those guidelines were set forth in *State v. Logan*, 60 Ohio St.2d 126, (1979), syllabus:

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

Here, we conclude that Mr. Winchester's conduct of forcing L.L. into the car was not the same conduct that constituted the rape. The rape occurred after dropping off the passenger and driving to a second location. This constituted "restraint [that] was prolonged" and "movement [that] was substantial so as to demonstrate a significance independent of" the rape. *See Logan* at syllabus. Therefore, there existed "a separate animus as to each offense sufficient to support separate convictions[.]" *See id.* Accordingly, Mr. Winchester's third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

> [MR. WINCHESTER] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF *STRICKLAND V. WASHINGTON*, THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

**{¶39}** In his first assignment of error, Mr. Winchester contends that his trial counsel was ineffective by failing to obtain evidence establishing that Mr. Winchester and L.L. knew each other prior to the incident in order to undermine L.L.'s credibility. We disagree.

{¶40} This Court must analyze claims of ineffective assistance of counsel under a standard of objective reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 688 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 142 (1989). Under this standard, a defendant must show (1) deficiency in the performance of counsel "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that the errors made by counsel were "so serious as to deprive the defendant of a fair trial [.]" *Strickland* at 687. A defendant must demonstrate prejudice by showing that, but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. In applying this test, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. With this standard in mind, we will examine separately the respects in which Mr. Winchester claims that his trial counsel was ineffective.

Genetic Testing

{¶41} First, Mr. Winchester argues that his counsel was ineffective for failing to request either genetic testing of L.L.'s child or to request any records related to genetic testing conducted on the child. Mr. Winchester maintains that these records may have indicated that Mr. Winchester fathered L.L.'s child, thereby lessening her credibility, as she testified that she did not know Mr. Winchester. However, it is mere speculation that the genetic tests would reveal that Mr. Winchester fathered L.L.'s baby. *State v. Zupancic*, 9th Dist. Wayne No. 12CA0065, 2013-Ohio-3072, ¶ 4 ("When affidavits or other proof outside the record are necessary to support an ineffective assistance claim, * * * it is not appropriate for consideration on direct appeal.") As the results of such testing are entirely speculative, we decline to pass upon whether evidence that Mr. Winchester was the biological father of L.L.'s child would have affected L.L.'s

credibility to such an extent that there is a reasonable probability that the jury would not believe the remainder of the testimony as to the commission of the offenses.

{¶42} Further, at the commencement of trial, the trial court ruled on a motion in limine filed by the State to exclude evidence of L.L.'s past sexual conduct on the basis of the rape shield law. The trial court granted the State's request. *See* R.C. 2907.02(D). During cross-examination of L.L.'s grandmother, defense counsel inquired as to who fathered L.L.'s child. Her grandmother responded with the name of a man who was not Mr. Winchester. The State then objected and, during a sidebar discussion, requested a mistrial because the questions raised by the defense counsel were in violation of the court's ruling on the motion in limine and the rape shield law. Defense counsel maintained that he had a good faith belief that Mr. Winchester was the father of the child, and the rape shield law did not preclude this line of questioning. Thereafter, the parties had a discussion off of the record. When the proceedings came back on the record, the trial court denied the State's motion for a mistrial and instructed defense counsel not to continue with this line of questioning, because the trial court concluded that the defense was attempting to circumvent the rape shield law by phrasing its questions in terms of parentage of L.L.'s child. The court concluded that parentage of L.L.'s child was irrelevant to the proceedings. On appeal, Mr. Winchester has not challenged this ruling. Therefore, we cannot discern in what way obtaining records demonstrating paternity, even had such records indicated that Mr. Winchester was the father of L.L.'s child, would have assisted him.

{¶43} Accordingly, we cannot conclude that Mr. Winchester was prejudiced by trial counsel's failure to obtain scientific proof of the biological father of L.L.'s child. *See State v. Ray*, 9th Dist. Summit No. 22459, 2005-Ohio-4941, ¶ 10 (this Court need not address both

prongs of *Strickland* where an appellant fails to prove either prong). Therefore, Mr. Winchester has failed to demonstrate ineffective assistance of counsel in this respect.

Unavailable Witness

{¶44} Next, Mr. Winchester argues that trial counsel was ineffective in failing to request that the purported passenger of Mr. Winchester's car, Teon Stallworth, be declared an unavailable witness pursuant to Evid.R. 804(A). At trial, the defense called Mr. Stallworth, but shortly after questioning began, the trial court stopped the proceedings to allow Mr. Stallworth the opportunity to consult with an attorney regarding his Fifth Amendment rights. After doing so, counsel for Mr. Stallworth indicated that his client would be invoking the Fifth Amendment, and the trial court instructed the jury to disregard Mr. Stallworth's brief testimony because he was not subjected to cross-examination. In Mr. Winchester's brief, Mr. Winchester indicates that Mr. Stallworth was prepared to testify that L.L. and Mr. Winchester had a previous relationship and that she voluntarily or willingly got into Mr. Winchester's car. However, having not testified, the record does not establish what Mr. Stallworth's testimony would have been as to the purported prior relationship, nor does it establish that Mr. Stallworth was the passenger of the vehicle on July 17, 2012, much less that he would testify that L.L. willingly got into the vehicle. Thus, the record before us is devoid of evidence supporting the argument that Mr. Winchester was prejudiced by trial counsel's purported failure. *See Zupancic* at ¶ 4, and *Ray* at ¶ 10.

{¶45} Accordingly, we cannot say that defense counsel was ineffective for failing to request that Mr. Stallworth be declared an unavailable witness. Therefore, his first assignment of error is overruled.

III.

**{¶46}** Mr. Winchester's assignments of error are overruled. The judgment of the Summit County Common Pleas Court is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
CARLA MOORE
FOR THE COURT

WHITMORE, J.
CONCURS.

BELFANCE, J.
CONCURRING IN JUDGMENT ONLY.

{¶47} I concur in the majority's judgment. I write separately to briefly discuss Mr. Winchester's first three assignments of error.

{¶48} With respect to Mr. Winchester's first assignment of error asserting ineffective assistance of counsel, Mr. Winchester's argument is premised upon the idea that Mr. Winchester and the victim knew each other and his counsel failed to produce evidence that would support his contention. He reasons that, if such evidence had been presented, it would have completely undermined the victim's assertion that her attacker was unknown to her.

{¶49} As part of his assertion that counsel failed to adequately prepare for trial, Mr. Winchester argues that DNA testing should have been completed on the victim's child in an attempt to demonstrate that Mr. Winchester was the father of the child. However, there is nothing in this record that demonstrates that counsel did or did not seek DNA testing. Moreover, there is nothing in the record that would suggest that the DNA test would establish Mr. Winchester's paternity of the victim's child. Thus, given the reliance on matters entirely outside the record, Mr. Winchester cannot prevail in a direct appeal.

{¶50} Mr. Winchester also complains that counsel was ineffective in failing to request that Teon Stallworth, who was allegedly in the vehicle with Mr. Winchester and the victim during a portion of the incident, be declared an unavailable witness. I agree that what Mr. Stallworth may have, or could have, said is not contained in the record before us and, therefore, cannot be considered by this Court.

{¶51} With respect to Mr. Winchester's second assignment of error in which he asserts that he was prevented from arguing that the victim continued to maintain a fabricated version of evidence in order to avoid prosecution, I agree his argument is properly overruled. As noted by

the majority, there is nothing in the record which would allow an inference that the victim had been threatened with criminal charges if she recanted. Further, it is unclear what more counsel would have said about the matter. However, Mr. Winchester was allowed to point out credibility issues with the jury by arguing that the victim's actions could indicate that her testimony might not be truthful. Thus, it is difficult to discern how Mr. Winchester was prejudiced.

{¶52} Finally, I agree that Mr. Winchester's third assignment of error is properly overruled. Based upon the evidence, Mr. Winchester's convictions for rape and kidnapping should not have merged. In light of the evidence adduced in this case, it can be concluded that the kidnapping began when the victim was forced into the car, and given the ensuing events, the kidnapping was committed separately and with a separate animus, and not merely incidental the to the commission of the rape. Accordingly, I agree that the trial court properly concluded the offenses were not allied. *See State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, ¶ 51 (stating that "if the offenses are committed separately, or if the defendant has [a] separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge[]").

{¶53} In light of the foregoing, I concur in the majority's judgment.


APPEARANCES:

ADAM VAN HO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.